[No. 15745. Department Two. August 6, 1920.]

AMERICAN SAVINGS BANK & TRUST COMPANY et al., *Respondents*, v. LENA GERTRUDE CLOSKY PETERSON, *Executrix etc., Appellant.*[1]

MORTGAGES (32)—VALIDITY—MENTAL CAPACITY—EVIDENCE—SUFFICIENCY. In an action to foreclose a mortgage, a finding of mental capacity to execute the note and mortgage is sustained where it appears that the maker was competent to manage his affairs, although there may have been some impairment of mentality as compared to times when the maker was at his best.

SAME (144)—FORECLOSURE—DEFENSES—WANT OF OR FAILURE OF CONSIDERATION—EVIDENCE—SUFFICIENCY. In an action to foreclose a mortgage given as security for stock purchased in a trust company, want or failure of consideration are not shown from the fact that the concern was in an unprosperous condition, where no representations were made as to the value of the stock, and the purchaser, who was vice president of the concern, had knowledge of the conditions and believed that care and skill would restore its prosperity, and that the stock would prove a profitable investment.

Appeal from a judgment of the superior court for Okanogan county, Neal, J., entered July 14, 1919, in favor of the plaintiffs, in an action to foreclose a mortgage, tried to the court. Affirmed.

*Kerr & McCord* and *Johnson* and *O'Conner (Wm. Z. Kerr,* of counsel), for appellant.

*J. Henry Smith, P. D. Smith,* and *W. C. Brown,* for respondents.

TOLMAN, J.—This action was brought by respondents, as plaintiffs, to foreclose a mortgage upon cer-

[1]Reported in 191 Pac. 837.

tain real estate in Okanogan county, given by M. W. Peterson, since deceased, to secure the payment of a note for $25,000, and interest, dated September 13, 1916. From a decree of foreclosure, this appeal is prosecuted.

It appears that, on August 10, 1915, one Phillips entered into a contract with respondent Murray to purchase from him 1,519 shares of the capital stock of the Bankers Trust Company of Tacoma (being a majority of the stock of that company), at the agreed price of $150,000. The stock being placed in escrow with the respondent American Savings Bank & Trust Company of Seattle, and prior to the entry of Peterson into the transaction, $50,000 had been paid on this contract, and the remaining $100,000 and accrued interest was due. Peterson, who had been a lifelong banker of excellent reputation and standing, theretofore holding important positions with banks in Seattle and Portland, became connected with the Bankers Trust Company as vice president about a month before he executed the note and mortgage, and assumed an active part in the management of its affairs, and had ample opportunity to ascertain its condition. Under these circumstances, he entered into an agreement with Phillips to take over the contract of purchase of the stock from Murray for the amount then due Murray, plus $25,000, or $25,000 less than Phillips agreed to pay for the stock, and the note and mortgage in suit were executed by Peterson at the place of business of the American Savings Bank & Trust Company, to the order of Phillips, representing the payment to him, and were immediately assigned by Phillips to the respondents, first, as collateral security for a note for $10,000 owing by Phillips to the American Savings Bank & Trust Company, and second, as collateral

security on the Murray contract; the time for the
payment of the remaining amount then due on the
.Murray contract being thereupon, in consideration of
the giving of such collateral, extended for one year.

Thereafter both Phillips and Peterson appear to
have been interested in providing funds to pay the
balance still owing Murray. Phillips appears to have
gone east, holding out the expectation that he would
procure eastern capital to take up the stock, in which,
however, he did not succeed. Peterson hoped to enlist
a bank in Portland with which he had formerly been
connected, but was disappointed, and thereafter at one
time seems to have thought that he could effect such
improvement in the affairs of the bank as to enable
him to interest Tacoma capital, and later he appears
to have placed his reliance upon obtaining the money
from a mining venture in British Columbia in which
he was interested, but which proved a failure.

The affairs of the Bankers Trust Company appear
to have lacked something of being in a prosperous con-
dition when Peterson made the purchase, and for some
months under his management there was little if any
change either way. Early in the year 1917, bank fail-
ures occurred in Seattle, and as a consequence deposits
were withdrawn from the Bankers Trust Company, its
condition became critical, the Clearing House Associa-
tion had to come to its assistance, and Peterson was
forced out of the management. Still later it was taken
over by, and consolidated with, the Scandinavian
American Bank of Tacoma. The record shows that
its assets were no more than sufficient to cover its lia-
bilities and pay to the stockholders perhaps two or
three per cent on the par value of their stock.

Before the year's extension expired, Peterson died
testate, his will was admitted to probate, appellant was

appointed executrix, and failing to pay either the amount due the respondent Murray or the interest on the mortgage note when it became due on September 13, 1917, Murray obtained a judgment against Phillips, sold the stock on execution, himself becoming the purchaser, and because of the failure to pay the annual interest, under an option contained in the note, the whole amount of the mortgage note was declared due A claim for such amount was filed with the executrix, and upon her failure to act thereon, this action was commenced.

The defenses pleaded and urged below were: (1) Want of consideration. (2) Fraud, undue influence, and want of mental capacity on the part of Peterson to execute the note and mortgage. (3) Failure of consideration.

In addition to these questions, it is urged here for the first time that the note is nonnegotiable, and therefore subject to defenses as though held by the original payee, and that a claim for the amount due was presented to the executrix, rejected by her, no suit was brought thereon within the time fixed by the probate code, and that therefore the note, as a negotiable instrument, is no longer of any effect; that the right to proceed under the mortgage alone remains, and that the rules incident to negotiable paper can no longer apply. We do not think either point well taken. The note is in the usual form, and when read as a whole presents nothing which would bar its negotiability. The record is silent as to any rejection, or notice of rejection, of the claim by the executrix as required by § 109, ch. 156, Laws of 1917, and in any event, the view we take of the evidence renders this point immaterial.

We have read with great care the conflicting evidence as to the mental condition of Peterson at, before

and after the time of the execution of the note and
mortgage, and while his mentality might have been
somewhat impaired at the time he entered into the
obligation, as compared with what it had been when
he was at his best, we are satisfied that he was then
competent to do business and manage his affairs. The
evidence as to incompetency, as we view it, is tinctured
with the very human element sometimes called "hind-
sight," and in view of the fact that afterwards, when
the progress of the disease was such that he broke
down physically, he also broke down mentally, it is
easy to see how honest men, looking back to incidents
regarding which, as they affected Peterson, they might
not have been fully informed, may have honestly con-
cluded that he was then so far mentally affected as to
be incompetent to manage his affairs.

As to the defenses of want of consideration and
failure of consideration, we cannot find that the proof
sustains either. Peterson, a successful banker of life-
long experience, was without occupation, and looking
about for an opening, he went to the Tacoma bank as
vice president a month before he purchased. He had
every opportunity to learn the bank's condition for
himself, and so far as the record shows, no one, then,
or at any time, made any representations to him
whatever regarding the value of what he afterwards
bought. He may, with reasonable accuracy, have dis-
covered the true condition of the bank at that time,
and yet have believed that care and skill would quickly
restore its prosperity, and that, as a going concern,
the stock was worth much more than its book value
and would prove a profitable investment on the terms
offered. That he had insufficient capital to handle the
matter alone and must interest others to take over the
obligation, in whole or in part, within the year before

the main portion of the purchase price became due, would not necessarily cause a capable man of affairs to hesitate. Fortunes are often made by taking such chances, and could he have sold at par within the year, he would have gained a clear profit of $25,000, or an even one hundred per cent on the amount which he hazarded. We are satisfied that, under the evidence, fairly and dispassionately considered, the result reached by the trial court was right. The judgment is affirmed.

HOLCOMB, C. J., FULLERTON, MOUNT, and BRIDGES, JJ., concur.